IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARRELL ANDREW LATTISAW   *

                                          CIVIL ACTION NO. CCB-13-2014

v.

     *

EASTERN CORRECTIONAL INSTITUTION
MEDICAL, et al.

     *

******

**MEMORANDUM**

Pending are dispositive motions filed on behalf of defendants Jennifer Castanares and Mahboob Ashraf (together, the "Medical Defendants") and the Division of Corrections ("DOC").[1] (ECF Nos. 16, 19, & 20.) Plaintiff Darrell Andrew Lattisaw has responded. (ECF No. 24.) Medical Defendants have replied. (ECF No. 25.) Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary. *See* Local R. 105.6. For the reasons stated below, the dispositive motions filed by the DOC and the Medical Defendants will be granted.

**Background**

On July 11, 2013, Lattisaw, who suffers from diabetes and is incarcerated at the Eastern Correctional Institution ("ECI"), filed a self-represented complaint. He claims that he was provided patches (Mediplast) for callus removal on his foot despite the fact that it contained a warning not to use if diabetic. According to Lattisaw, he was advised by Dr. Terri and Physician's Assistant ("PA") Davis not to use Mediplast on his feet anymore; however, Nurse Jennifer Castanares disregarded these instructions by telling Dr. Mahboob Ashraf to order the patch for his feet. Lattisaw asserts that Mediplast caused his foot to become infected, and that Dr. Ashraf had to perform surgery. (ECF Nos. 1 & 5.)

---

[1] The pending motions for extension of time (ECF Nos. 12 & 15) are granted nunc pro tunc.

1

Lattisaw's uncontroverted medical records demonstrate that he is a "chronic care" patient because he suffers from diabetes. (ECF No. 16, Ex. 2, at 2.) As a chronic care patient, he is seen regularly by prison medical staff to monitor and control his diabetes. (*Id.*) Lattisaw has been counseled that he may be prone to foot ulcers, poor healing of injuries to extremities, and the formation of calluses and/or ingrown toenails due to other complications of diabetes, such as neuropathy, poor circulation, and lower response to infection. (*Id.*) Additionally, he has been advised that proper management and control of his diabetes has direct effects on his health, particularly the health of his lower extremities. (*Id.*) Notwithstanding this advice, Lattisaw's medical records demonstrate he is noncompliant with his diabetic diet and medications and regularly refuses to have lab work done to monitor his condition. (ECF No. 16, Ex. 1, at 18, 25.)

Lattisaw filled out a sick call slip on March 5, 2012, indicating that he needed treatment for his left foot which had become infected after an "object fell on it." (*Id.* at 99.) He submitted the form to medical staff on March 13, 2012, (ECF No. 16, Ex. 2, at 2), and was seen by Melissa Hixon, R.N. on March 14, 2012, (ECF No. 16, Ex. 1, at 4-5.). Lattisaw advised Hixon that he dropped a cart on his foot around Christmas of 2011. (ECF No. 16, Ex. 1, at 4.) He complained of limited range of movement and drainage from his left great toe. (*Id.*) His left first digit was bruised, and thick bloody drainage was visible on the bandage. (*Id.*) Hixon consulted with Paul Matera, M.D., who ordered an x-ray. (ECF No. 16, Ex. 2, at 3.) Lattisaw was prescribed Keflex, an antibiotic, and advised to regularly soak his foot in Epsom salt until the problem resolved. (ECF No. 16, Ex. 1, at 4.) He was also scheduled for a follow up. (*Id.*)

Lattisaw was seen by Cynthia Tingle, LPN on March 17, 2012. (*Id.* at 6.) He reported that he had been soaking his foot and taking the antibiotics as directed, but complained of a small amount of discomfort and drainage. (*Id.*) He was seen the following day and again on March 21,

2012, for continued soaking of his foot. (*Id.* at 7–8.) No complaints or concerns were noted on either occasion. (*Id.*)

On March 23, 2012, Lattisaw was seen by PA Jessica Cecil who advised him that the x-rays showed no fractures to his toe. (*Id.* at 9-10.) PA Cecil observed that Lattisaw's left great toenail was lifted off of the nail bed, and saw clear drainage when the nail was pressed. (*Id.* at 9.) She discontinued Lattisaw's Epsom salt soaks and scheduled a procedure to have his left great toenail removed. (*Id.*) Lattisaw was provided band-aids and gauze and instructed to continue taking the prescribed antibiotics. (*Id.*)

On April 17, 2012, Lattisaw was seen by medical staff to have the left great toenail removed. (*Id.* at 11.) PA Cecil, however, observed that the nail was "almost grown out" with the proximal portion of the nail attached to the base. (*Id.*) She did not observe any drainage or infection, nor was the toe tender. (*Id.*) Thus, the procedure was not performed as it was deemed no longer necessary. (*Id.*)

Lattisaw was seen by Nurse Ellen Moyer on April 25, 2012, due to low blood sugar. He was provided glucose tabs and food. (*Id.*) At that time, he voiced no complaints regarding his toe. (*Id.*)

On May 21, 2012, Lattisaw was seen by Dr. Quilo for a chronic care visit. (*Id.* at 13-14.) He made no complaints and refused to have blood work done. (*Id.*) His extremities were examined and appeared normal. (*Id.*)

Lattisaw was evaluated by PA Bruce Ford on June 12, 2012, at which time his medications were renewed. (*Id.* at 15-16.) His extremities were observed and again appeared normal. (*Id.* at 16.)

On August 29, 2012, Lattisaw was seen by PA Peter Stanford for a chronic care visit. (*Id.* at 18-20.) He again refused lab work, and complained of pain in his left foot, particularly his little toe, rating the pain as a five to seven on a scale of one to ten. (*Id.* at 18.) PA Stanford observed no swelling, ulceration, or deformity of the toes. (*Id.*) Hyperpigmentation was, however, observed on the back of Lattisaw's left foot. (*Id.*)

Lattisaw did not appear for his medical appointment on November 1, 2012. (*Id.* at 22.) PA Maryam Messforosh saw him on December 7, 2012, for a chronic care visit. (*Id.* at 25-27.) He was noted as noncompliant with his diet and medications and again refused lab work. (*Id.* at 25.) A foot exam was completed, although he did not complain of any problems with his feet. (*Id.* at 26.) He was referred to Behavioral Health to determine if he was "mentally competent to take care of himself medically." (*Id.*)

On December 13, 2012, Lattisaw was evaluated regarding his noncompliance with his treatment regimen. (*Id.* at 28-31.) He was rational, and understood that he had to take his medications to address his diabetic condition. (*Id.* at 28.) PA Vincent Siracusano indicated that Lattisaw appeared competent to make his own decisions regarding treatment. (*Id.*)

Lattisaw was seen by JoVonne Osborne, CRNP on January 7, 2013, for follow up. (*Id.* at 32-33.) He appeared upset and requested all his medications be refilled, but he was unable to name the medications he wanted. (*Id.* at 32.) Osborne attempted to review his medications with him, but Lattisaw refused to do so. (*Id.*) His blood sugar was normal, and he offered no complaints regarding his feet. (*Id.* at 32-33.) The following day, he was seen by Nurse Judith Hearthway for a chronic care visit. (*Id.* at 34-36.) He again offered no complaints regarding his left foot. (*Id.*) On January 9, 2013, he filed a sick call slip, alleging that he had been given medication for high blood pressure, which he did not suffer. (*Id.* at 100.)

Lattisaw was seen by PA Stanford on January 23, 2013, due to his complaint regarding the blood pressure medication. (*Id.* at 37-39.) He reported calluses on his toes and a lesion that was tender. (*Id.* at 37.) Mediplast was applied to calluses on his feet. (*Id.* at 38.)

Lattisaw was again seen by PA Stanford on January 30, 2013. (*Id.* at 40-45.) He voiced no complaints regarding his diabetes and reported compliance with his medication. (*Id.* at 40.) The Mediplast pad was removed from his right foot, and a fresh pad was placed on his left foot. (*Id.*) Although Lattisaw's calluses were still present, they had begun to loosen around the edges. (*Id.*) Otherwise, his extremities appeared normal. (*Id.*)

On February 5, 2013, Lattisaw was examined by Nurse Castanares. (*Id.* at 46-47.) She observed that his Mediplast was not on the appropriate area but rather was "stuck to the bottom of" his foot. (*Id.* at 47.) Lattisaw stated that he had removed the pad when he took a shower. (*Id.*) Nurse Castanares applied a fresh pad. (*Id.*)

She saw Lattisaw again on February 13, 2013, at which time she replaced the Mediplast pad. (*Id.* at 48.) On February 15, 2013, Lattisaw had a follow up visit with Nurse Castanares. (*Id.* at 49.) The pad was not on his foot, and Lattisaw stated that he had difficulty keeping it on. (*Id.*) Nurse Castanares referred him to a provider for diabetic callus removal. (*Id.*)

On February 20, 2013, Lattisaw was seen by PA Terri Davis. (*Id.* at 50-51.) PA Davis noted that the Mediplast was ineffective due to its coming off in the shower. (*Id.*) Lattisaw indicated that the callus was not painful or bothersome. (*Id.*) Examination revealed no ulceration of Lattisaw's extremities. (*Id.* at 51.) A one-centimeter callus, however, was observed on his left great toe. (*Id.*) The callus was shaved with a scalpel, and no pain, bleeding, or damage to healthy tissue was noted. (*Id.*) PA Davis ordered the use of Mediplast continued for 30 days to reduce the callus. (*Id.*) Lattisaw was directed to apply a fresh pad every other day, and PA Davis

discussed with him the risks and side effects of his treatment. (*Id.*) On February 22, 2013, Lattisaw was seen by Nurse Castanares, who replaced the Mediplast pad. (*Id.* at 52.)

Lattisaw was seen by Dr. Ashraf for a chronic care visit on March 6, 2013. (*Id.* at 53-55.) Dr. Ashraf extended his treatment with Mediplast through July 6, 2013. (*Id.* at 54.)

On April 3, 2013, Lattisaw met again with Dr. Ashraf for a chronic care appointment. (*Id.* at 58-60.) Lattisaw refused to have lab work performed and complained of left foot pain. (*Id.* at 58.) There was no sign of diabetic neuropathies, although his left foot showed a "mild cal[l]us formation yellowish in coloration for which [M]ediplast has been placed by nurse. No sign of infection noted." (*Id.* at 58-59.)

Lattisaw was seen by Dr. Ashraf on April 11, 2013, at which time an ulcer was observed at the fifth metatarsal area. (*Id.* at 61-62.) The ulcer was two centimeters long and one centimeter wide with a depth of half a centimeter. (*Id.* at 61.) Lattisaw consented to a change of dressing and removal of the necrotic tissue surrounding the ulcer, which was done with scalpel and forceps. (*Id.*) He was given a xylocaine injection, and the necrotic tissue was removed. (*Id.*) After the procedure, he was given an antibiotic and Neosporin. (*Id.*) Use of Mediplast was discontinued on the same day per Dr. Ashraf's orders. (*Id.* at 62.) Dr. Ashraf also directed Lattisaw to receive daily wound care with dressing changes and Neosporin ointment for the ulcer. (*Id.*) Lattisaw was placed on bed rest and directed to refrain from working until his foot healed. (*Id.*)

The following day, Nurse Castanares saw Lattisaw in the Wound Care Clinic. (*Id.* at 63.) He requested "foot pads" and said that he went to work that day despite Dr. Ashraf's orders. (*Id.*) Nurse Castanares advised him to refrain from working as he was put on bed rest. (*Id.*) She also changed his dressing and cleaned the site as directed by Dr. Ashraf. (*Id.* at 63, 105.) Lattisaw's

foot was healing with no sign so infection or draining.  (*Id.* at 105.)  He reported his pain as zero out of ten.  (*Id.*)

Lattisaw was seen by Dianna Baker, LPN for wound care on April 16, 2013.  (*Id.* at 64.)  He had another wound care appointment with Nurse Castanares on April 19, 2013.  (*Id.* at 65-67.)  Nurse Castanares, per Dr. Ashraf's orders, cleaned Lattisaw's foot, applied the topical ointment, and changed the dressing.  (*Id.* at 65.)  She noted that his foot was healing well with no signs or symptoms of infection.  (*Id.*)  He reported his pain as zero out of ten and expressed his desire to return to work.  (*Id*. at 65, 105.)  Lattisaw was scheduled for a follow up visit in a week and directed to continue morning dressing changes with antibacterial ointment and to keep the wound clean and leave it open to air at night.  (*Id.* at 65-57.)  On that same day, PA Davis also ordered daily wound care cleaning of Lattisaw's left foot, with the wound to be covered and secured with gauze.  (*Id.* at 68-69.)  PA Davis further permitted Lattisaw to return to work.  (*Id.* at 68.)

On April 22 and 24, 2013, Lattisaw was seen by medical personnel who noted that his foot was healing.  (*Id.* at 105.)  No drainage was observed, and he reported his pain as zero out of ten.  (*Id.*)  Lattisaw was discharged from the Wound Care Clinic on April 26, 2013, by Nurse Castanares after examination showed the wound had fully healed.  (*Id.* at 70, 105.)

On May 7, 2013, Lattisaw was examined by Dr. Ashraf.  (*Id.* at 71-73.)  Dr. Ashraf noted a small ulceration on the medial side of the left first metatarsal, and so he cleaned the ulcer and applied ointment.  (*Id.* at 71.)  He also observed two ulcerations on Lattisaw's right foot and one more on his left.  (*Id.*)  Lattisaw was provided an antiseptic bandage.  (*Id.*)

Dr. Ashraf saw Lattisaw again on May 28, 2013.  (*Id.* at 74-77.)  An ulcer was observed on the left foot, although his sensation remained intact.  (*Id.* at 75.)  Additionally, he was diagnosed with a mild infection on his left toe for which he was given antibiotics.  (*Id.* at 74.)

Lattisaw was seen by Nurse Castanares on June 26, 2013, due to his complaints that his foot was infected again. (*Id.* at 78-82.) Nurse Castanares observed no evidence of infection or drainage but noted a hard darkened callus on the lateral aspect of his left foot. (*Id.* at 80.) Lattisaw failed to appear for his next scheduled follow up on July 2, 2013. (*Id.* at 83.)

He was next seen by Dr. Ashraf on August 5, 2013, in the Chronic Care Clinic. (*Id.* at 84-87.) Dr. Ashraf noted that the ulcer on Lattisaw's left foot was healing well. (*Id.* at 84.) No discharge or infections were observed. (*Id.* at 85.)

Lattisaw failed to appear for his next scheduled visits on September 5 and October 7, 2013. (*Id.* at 88-89, 91.) He was observed, however, working in the kitchen on October 7, 2013. (*Id.* at 91.)

Lattisaw came to the Chronic Care Clinic on October 9, 2013, but left before he was examined. (*Id.* at 92-93.) According to Dr. Ashraf, he demanded medications that were not appropriate for him. (*Id.* at 92.) Lattisaw left his medication on the table and advised Dr. Ashraf that he would not take his medication if he did not get what he wanted. (*Id.*) Because Dr. Ashraf was unable to conduct an examination, Lattisaw signed a release of responsibility. (*Id.* at 94, 106.) In the medical records, Dr. Ashraf noted Lattisaw's carelessness with his treatment and disregard of medical advice. (*Id.* at 92.)

Lattisaw was scheduled for a chronic care appointment on October 31, 2013, but could not attend because the prison was on lockdown. (*Id.* at 95.)

Dr. Ashraf examined him on November 4, 2013. (*Id.* at 96-97.) He offered no complaints, and the examination revealed no ulcers or problems with his feet. (*Id.* at 96.)

**Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

**Analysis**

**A. ECI Medical**

To sustain an action under 42 U.S.C. § 1983, the plaintiff must demonstrate that: (1) he suffered a deprivation of rights secured by the Constitution of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law. *West v. Atkins*, 487 U.S. 42, 48 (1988). There is no legal entity named "ECI Medical." Because

defendant "ECI Medical" is not a "person" subject to suit or liability under § 1983, Lattisaw's complaint against that defendant shall be dismissed.

### B. Sovereign Immunity

Under the Eleventh Amendment, a state, including its agencies and departments, is immune from federal lawsuits brought by its citizens or the citizens of another state, absent consent. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also Global Mail Ltd. v. U.S. Postal Serv.*, 142 F.3d 208, 210 (4th Cir. 1998) ("Sovereign immunity deprives a court of jurisdiction to hear a case."). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see, e.g.*, Md. Code. Ann., State Gov't § 12-201(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Thus, Lattisaw's complaint against the DOC, an agency within the State of Maryland, is barred by the Eleventh Amendment, and it will be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.

### C. Medical Claim

As interpreted by the Supreme Court, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). In the context of denial of medical care, an Eighth Amendment violation arises when the actions of the defendants, or their failure to act, amount to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to provide it or

ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (explaining that society does not expect that prisoners will have unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (citation and internal quotation marks omitted). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. The reasonableness of the defendant's actions must be judged in light of the risk that he knew. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference . . . ." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge requirement is not met. *Id.* at 169 (reasoning that actions inconsistent with an effort to hide a serious medical condition refute the presence of subjective knowledge). Mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference. *See Russell v.*

11

*Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (concluding that, where a prisoner was under constant medical supervision, his claims did not rise to the level of deliberate indifference).

The thrust of Lattisaw's claim is that Mediplast should not be used by diabetics and that Medical Defendants were negligent in prescribing the same. He further alleges that Nurse Castanares and Dr. Ashraf disregarded PA Davis's instructions not to use Mediplast. His mere disagreement, however, with the prescribed course of treatment for his diabetes, foot ulcers, and calluses is insufficient to establish an Eighth Amendment claim of deliberate indifference. Even if Lattisaw is correct that PA Davis disagreed with Nurse Castanares and Dr. Ashraf regarding the use of Mediplast, such a disagreement does not demonstrate that Nurse Castanares and Dr. Ashraf were deliberately indifferent to his medical needs.

His medical records demonstrate he has received constitutionally adequate medical care. There is nothing in the medical records to support Lattisaw's contention that Mediplast caused his foot infection. As a diabetic patient, he is prone to foot ulcers and calluses. His medical records show that he was regularly seen by medical staff who inspected his feet and provided a variety of care for the difficulties he developed, including use of Epsom salt soaks, Mediplast, topical ointments, bandaging, and antibiotics.

Likewise, there is no documentary evidence that Nurse Castanares violated the orders of the physician or PA as Lattisaw alleges. To the contrary, Mediplast was supplied to Lattisaw to treat his calluses and, although he did not fully comply with its use,[2] it did help in resolving some of his foot problems. After he developed other problems with his feet, the use of Mediplast was discontinued. Lattisaw's claim that Medical Defendants were negligent in prescribing Mediplast is insufficient to sustain an Eighth Amendment claim. *See Johnson*, 145 F.3d at 166.

---

[2] The record shows that Lattisaw is regularly non-compliant with his diabetic care, to the extent that he was referred for a psychological assessment to determine whether he was competent to make decisions regarding his care. He was found competent and thereafter continued to disregard the directions of medical staff.

**Conclusion**

For the reasons stated, summary judgment is granted in favor of the Medical Defendants. Lattisaw's complaint is dismissed as to the DOC.

A separate Order follows.

<u>July 7, 2014</u>                                             <u>        /s/                                </u>
Date                                                                Catherine C. Blake
                                                                         United States District Judge